OSCN Found Document:MONEXCO, LLC v. CORPORATION COMMISSION OF OKLAHOMA

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 MONEXCO, LLC v. CORPORATION COMMISSION OF OKLAHOMA
2023 OK CIV APP 34
Case Number: 119361
Decided: 12/28/2022
Mandate Issued: 10/12/2023
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV

Cite as: 2023 OK CIV APP 34, __ P.3d __

 

MONEXCO, LLC, Applicant/Appellant,
v.
THE CORPORATION COMMISSION OF THE STATE OF OKLAHOMA and BADGER MIDSTREAM, L.P., Protestants/Appellees.

APPEAL FROM THE CORPORATION COMMISSION

AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH FURTHER INSTRUCTIONS

James M. Peters, MONNET, HAYES, BULLIS, THOMPSON & EDWARDS, PLLC, Oklahoma City, Oklahoma, for Applicant/Appellant

Patricia L. Franz, GENERAL COUNSEL, OKLAHOMA CORPORATION COMMISSION, Daniel Boyle, DEPUTY GENERAL COUNSEL, Dana M. W. Ashcraft, DEPUTY CHIEF LEGAL COUNSEL, James L. Myles, ASSISTANT GENERAL COUNSEL, Oklahoma City, Oklahoma, for Protestant/Appellee Oklahoma Corporation Commission

Eric R. King, Dane H. Miller, FELLERS, SNIDER, BLANKENSHIP, BAILEY & TIPPENS, P.C., Oklahoma City, Oklahoma, for Protestant/Appellee Badger Midstream, L.P.

STACIE L. HIXON, JUDGE:

¶1 Monexco filed a complaint with the Oklahoma Corporation Commission (OCC) pursuant to the Production and Transportation Act (of 1913) (PTA), 52 O.S.2011, § 24.1 et seq., asserting the fees and/or terms and conditions of a contract with ELCHenergy, LLC, a subsidiary of Badger Midstream, L.P. (Badger), were unjust, unfair, unreasonable, and unduly discriminatory. Although the OCC agreed the fees and terms were unfair, unjust, and inequitable, it denied Monexco's request that the final fees and terms be applied retroactively. Monexco appeals that portion of OCC Order No. 716416 denying retroactive application.

¶2 Based on our review of the record and applicable law, we reverse that portion of Order No. 716416 which declined to apply final fees and terms from the time when Monexco filed its Complaint forward, based on a finding the OCC lacked statutory authority to abrogate daily unilateral contracts between Monexco and Badger pursuant to 52 O.S.2011, § 24.5(A). Specifically, we find no contract was in force upon the filing of the Complaint. The OCC had statutory authority to grant the requested relief from that point forward. The matter is remanded to allow the OCC to determine whether any adjustment to fees paid between the Complaint and its order setting fees is required by section 24.5(F).

BACKGROUND

¶3 Monexco operates the Warren 1-27 and Warren 2-34 wells in Cimarron County, Oklahoma.[1] DCP Midstream (DCP) gathered and sold gas from Monexco's wells pursuant to a written gas purchase contract. On October 21, 2015, DCP notified Monexco that it was canceling the parties' current gas purchase contract as of December 31, 2015.[2] DCP proposed a replacement contract to be effective January 1, 2016. The accompanying Notice Letter provided, in relevant part:

Because you are a valued supplier, DCP desires to continue our relationship under the enclosed Replacement Contract. . . . In the absence of an executed Replacement Contract, if your company makes deliveries of gas to DCP at the Delivery Points identified in the enclosed Replacement Contract after its effective date, your company will be accepting on a day to day basis the prices and terms and conditions as to the gas actually delivered, and until further notice, DCP will rely on that acceptance and perform accordingly.

Monexco did not accept or execute the replacement contract. However, it continued to deliver gas into DCP's gathering system.

¶4 On March 25, 2016, DCP notified Monexco it was transferring the gathering system to Badger effective May 1, 2016. DCP, and subsequently Badger, paid Monexco for gas from the wells pursuant to the terms identified in the replacement contract thereafter. On January 4, 2017, Badger notified Monexco that the terms of the replacement contract were disadvantageous to Badger and offered a new contract to be effective January 1, 2017. The email further provides, in relevant part:

Please review this contract and execute prior to January 20, 2017 in order for the contract to be effective. If you prefer to continue to operate under the terms of your existing agreement, do not execute the attached [contract], and we will continue to operate and purchase your production under the January 1, 2016 provisions.

¶5 Monexco did not execute the proposed replacement contract. On January 17, 2017, Monexco filed a complaint with the OCC pursuant to the PTA, 52 O.S.2011, § 24.1 et seq., asserting the terms and provisions of the proposed replacement contract were unjust, unfair, unreasonable, and unduly discriminatory. Monexco's Complaint also requested the OCC enter an interim order effective January 1, 2016 requiring Badger to continue providing services as set forth in the original contract unless an agreement between the parties was otherwise reached.

¶6 Thereafter, the parties attempted to negotiate new contract terms. However, on March 29, 2017, Badger provided Monexco with thirty days' written notice of termination and that it was releasing Monexco from any further dedication of gas effective May 1, 2017. Monexco filed an application for emergency order on
April 26, 2017, seeking an order prohibiting Badger from discontinuing gas gathering services, to be provided at the rate and conditions set forth in the original gas purchase contract through the pendency of the case. Monexco noted it had no alternative for such services. On June 20, 2017, Monexco dismissed its application upon Badger's agreement to continue taking Monexco's gas during the pendency of the case.

¶7 After a trial on the merits, the Administrative Law Judge (ALJ) found the terms of the proposed 2017 contract to be unfair, unjust, and inequitable. The ALJ ordered Badger pay Monexco for gas from the Warren wells prospectively under the same terms and conditions as set forth in a separate contract applicable to Monexco's Florence 1-18 well.[3] The ALJ denied Monexco's request that the order be applied retroactively to July 1, 2016, noting the OCC could not abrogate the terms of the existing day-to-day contracts created by Monexco's daily shipping of gas, citing section 24.5(A).

¶8 After Monexco filed an exception to the ALJ's report, a hearing was held before an Appellate Referee. On August 4, 2020, the Appellate Referee issued a report, agreeing with the ALJ that after the original gas gathering contract was canceled, Monexco chose to continue delivering gas on a day-by-day basis to DCP (and then Badger) and that each delivery of gas formed a standalone unilateral contract for that day's sales. Thus, the OCC lacked statutory authority to retroactively apply the final fees and terms under section 24.5(A).

¶9 On January 15, 2021, the OCC issued Order No. 716416, finding the terms of the contract to be unfair, unjust, and inequitable and that the fees and terms from the Florence contract should be applied. The Order further provides, in relevant part:

THE COMMISSION FURTHER ORDERS Monexco's continued delivery of gas to Badger on a day-by-day basis, after cancellation of the Duke contract and refusal to execute the replacement DCP (successor Badger) contract, resulted in standalone, unilateral contracts which the Commission lacks statutory authority to abrogate. Therefore, from January 1, 2016, through this Order the issuance date of this Order, the Commission cannot abrogate the existing prior day-to-day contracts between Monexco and Badger, pursuant to 52 O.S. §24.5(A).

¶10 Monexco appeals.

STANDARD OF REVIEW

¶11 Oklahoma Constitution Article IX, Section 20 provides the standard of review for appeals from the Corporation Commission:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.

¶12 "The Commission has a wide discretion in the performance of its statutory duties, and this Court may not substitute its judgment upon disputed factual determinations for that of the Commission but is restricted to a determination of substantial evidentiary support for the order issued under authority of the statutes." Sundown Energy, L.P. v. Harding & Shelton, Inc., 2010 OK 88, ¶ 9, 245 P.3d 1226.

¶13 Statutory interpretation presents a question of law, which we review de novo. Troxell v. Oklahoma Dep't of Human Servs., 2013 OK 100, ¶ 4, 318 P.3d 206. De novo review is non-deferential, plenary, and independent. Neil Acquisitions,
LLC v. Wingrod Inv. Corp., 1996 OK 125, ¶ 5 n.1, 932 P.2d 1100.

ANALYSIS

¶14 Section 24.5(A) provides the OCC authority to remedy unfair, unjust, unreasonable or unduly discriminatory gathering fees as follows:

A. No gatherer shall charge any fee or require any terms and conditions of service, or both, for gathering, which is unfair, unjust, unreasonable, or unduly discriminatory under the standard specified in and as provided by subsection D of this section. Upon complaint of an aggrieved party filed pursuant to this act, the Corporation Commission shall have the authority to remedy any such fee or terms and conditions of service, or both, for gathering, by:

1. Ordering an adjustment of the fee or terms and conditions of service, or both, as to the aggrieved party to the extent necessary to remove any unfair, unjust, unreasonable, or unduly discriminatory portion of such fee or terms and conditions of service, or both, under the standard specified in and as provided by subsection D of this section; and, if applicable,

2. Ordering the continuation of gathering service during the pendency of the complaint as provided in subsection F of this section; or

3. Ordering the application of fees and terms and conditions of service established by an order previously issued by the Commission under this act be applied to a similarly situated shipper as specified in subsection L of this section.

Nothing in this section shall operate to abrogate the terms of an existing contract while the contract is in force. Upon the expiration or cancellation of an existing contract, under the terms of the contract, the provisions of this section shall apply.

¶15 Section 24.5(D) provides that an action for such relief is initiated by filing a complaint and provides certain deadlines for notice and hearing of the complaint. It also provides that, "[i]f the parties are unable to agree on an interim fee or terms and conditions of service, or both, for gathering to apply during the pendency of the complaint before the Commission, then the Commission may set such interim fee or terms and conditions of service, or both, under the provisions of subsection F of this section." (emphasis added). In turn, section 25.4(F) provides in part that,

F. Upon the filing of a complaint under this section which seeks to continue an existing gathering service, the Commission on motion of the complainant shall require continuation of gathering service under the fees and terms and conditions of service of the last expired contract, if any, during the pendency of the complaint, or set an interim fee and terms and conditions of service. . . . Interim relief shall be by order of the Commission after notice to the gatherer from whom gathering service is being requested and subsequent hearing. Any fees for gathering collected during the period a complaint which seeks to set a fee for such gathering is pending shall be subject to the fee finally set by the Commission. If the finally determined fee is less than the collected fee, the excess shall be refunded to the complainant within fifteen (15) days after the final determination of the fee, together with interest at a rate established by the Commission. If the finally determined fee is greater than the collected fee, the excess shall be paid by the complainant to the gatherer within fifteen (15) days after the fee is finally determined, together with interest at a rate established by the Commission.

(emphasis added).

¶16 While the OCC set a fee prospectively in Order No. 716416, Monexco contended that it was entitled to the difference between that final fee and rates under the original contract which expired in 2016 pursuant to section 24.5(F), or alternatively, from the filing of its 2017 Complaint forward. OCC denied Monexco the requested retroactive relief based on its determination that (1) Monexco and Badger were operating under day-to-day standalone contracts for gathering from the time of Monexco's first rejection of the proposed replacement contract through the OCC's final order setting fees, and (2) thus, that the OCC did not have statutory authority to abrogate those existing contracts under the language of section 24.5(A) of the PTA.

¶17 The parties have argued, in part, that interpretation of the term "existing contract" is the crux of the parties' dispute on appeal. Monexco contends "existing contract" means only those contracts in existence before section 24.5(A) was enacted or last amended in 2005.[4] Thus, Monexco contends the OCC has the authority to modify any existing gathering contract agreed to by parties entered after 2005, which would apply in this case. Badger and the OCC disagree, asserting that Monexco's interpretation would amount to constitutional rate making and would lead to an absurdity. Badger asserts that "existing contract" means any contract in existence at the present time, i.e., at the time the complaint is brought or until the OCC acts.

¶18 Despite their arguments regarding the meaning of "existing contracts" and creation of day-to-day standalone contracts, we first note that both Badger and the OCC appear to acknowledge that the OCC could have provided Monexco with interim relief from discriminatory or unreasonable fees or terms from the filing of the Complaint, had Monexco only requested it. They contend that relief was unavailable because Monexco failed to ask for it. This argument is not supported by the record.[5]

¶19 It is undisputed from the facts of record that Monexco rejected the January 2016 written contract proposed by DCP. Pursuant to DCP's letter of October 21, 2015, if Monexco delivered gas into DCP's gathering system thereafter, its delivery would be considered as an acceptance of the terms of the January 2016 contract on a day-to-day basis. Monexco continued to deliver gas and filed no complaint for nearly a year. By January 2017, Badger had taken over the gathering system. On January 4, 2017, Badger had offered Monexco a different written contract to become effective retroactively on January 1, 2017, which it is undisputed Monexco did not execute. Badger proposed at that time that, if Monexco did not accept the contract, Badger would continue to purchase Monexco's gas under the January 1, 2016 provisions. Shortly thereafter, Monexco filed its Complaint with the OCC.

¶20 While Badger asserts that Monexco sought no interim relief and continued to enter into day-to-day standalone contracts by shipping gas even after the Complaint was filed, we find that position to be inconsistent with the record. First, Monexco requested in its Complaint an interim order requiring Badger to continue gathering services at the last contract rate, or upon an interim rate to be set by the OCC. Undisputed evidence of record reflects that Monexco and Badger continued to negotiate thereafter but reached an impasse in March 2017, at which time Badger gave Monexco thirty days' written notice of termination of its services, effective May 1, 2017.

¶21 At that point, Monexco filed an Application for Emergency Order requesting Badger be prohibited from discontinuing service until the merits of Monexco's Complaint could be determined. Badger further asserts that Monexco has no right to retroactive relief, because Monexco dismissed that Application without prejudice. However, Badger's witness Beth Medlin[6] testified that, upon filing of the application to have the wells stay on, "we agreed to allow that to happen. So we told them that we would allow the wells to continue to flow while we were trying to work out resolution." Despite arguments proposed in this appeal, Medlin acknowledged during hearings before the OCC that it was unnecessary for Monexco to pursue emergency relief:

Q. You were asked some questions about the filing of the emergency, and the emergency request was that Badger continued to take gas from Monexco wells; is that right?

A. That's correct.

Q. All right. And did your own Counsel suggest that, as an accommodation to Monexco, that you should just continue to take Monexco's gas?

A. Yes.

Q. And was it necessary for Monexco to have an OCC hearing on the request for the emergency relief?

A. It should not have been. We wanted to meet with them.

In light of the undisputed evidence and this testimony, it is disingenuous for Badger to argue on appeal that Monexco is not entitled to the relief sought from time the Complaint was filed, or because it dismissed its application for emergency relief, and was operating under day-to-day standalone contracts.

¶22 Further, though the Court acknowledges the parties' differing interpretations of the term "existing contract," and the dearth of authority interpreting this statute, it is only necessary to reach this question if there was a contract in force which OCC was called upon to modify in the first place.[7] The basis of the OCC's denial of an adjustment to fees was its finding that Monexco was party to a series of day-to-day contracts in force up through the time of its ruling, which it found to be existing contracts it could not abrogate. Under our standard of review, we examine whether the OCC's findings of fact and conclusions are sustained by law and substantial evidence. We find they are not.

¶23 While Badger essentially asserts that Monexco's continued delivery of gas into Badger's system during the pendency of the Complaint constituted acceptance of a contract on a day-to-day, the parties' dealings in their entirety are inconsistent with the formation and existence of a contract at that time.

¶24 The rules of offer and acceptance and of mutual assent control any issue of contract formation. In re De-Annexation of Certain Real Property from the City of Seminole, 2009 OK 18, ¶ 8, 204 P.3d 87. That consent must be free, mutual, and communicated by each to the other. Id. at ¶ 9. Consent is not mutual unless all parties agree to the same thing in the same sense. Id. "To constitute acceptance, there must be an expression of the intent to accept the offer, by word, sign, writing or act, communicated or delivered to the person making the offer or the offer's agent." Triad Transport, Inc. v. Wynne, 2012 OK 30, ¶ 8, 276 P.3d 1013.

¶25 Monexco's response to Badger's offer of a replacement contract, or alternate "day to day" contract in 2017 was to file its Complaint, which requested interim relief and continuation of existing service. While Monexco continued to deliver gas thereafter, Badger admitted that the parties agreed for this to be so, with knowledge of the pending Complaint, which, as stated, included a request that Badger be prohibited from discontinuing service, and request for the OCC to resolve the issue of Badger's alleged unreasonable or discriminatory fees. Though Badger's offer established delivery of gas as the mode to accept a day-to-day contract, this day-to-day contract was not the only mode through which gathering services could be continued, and Monexco's gas delivered. Under the record presented, Monexco plainly did not accept Badger's terms, sought relief, and reached an agreement to continue delivering gas pending the outcome of the underlying action. Further, it is doubtful that any "consent" to Badger's proposal was "free" in the sense required by 15 O.S.2011, § 51 to form the "existing contract" the Commission found governed the parties' relationship.[8] Though the exact terms of the parties' agreement are not fully set out, it is clear that Monexco and Badger made an interim arrangement on delivery and fees pending outcome of the Complaint, as is contemplated by section 24.5(D) and is addressed further below. Under these circumstances, we find the OCC's determination that it did not have the authority by statute to adjust the final fees back to the time the Complaint was filed to be in error and hold that the OCC's determination the parties were subject to stand alone day-to-day contracts following the filing of the Complaint is not supported by substantial evidence.

¶26 Finally, though we find the OCC erred in its conclusion that it had no authority to adjust fees collected during the Complaint proceeding under the record before us, that record is not sufficient to determine whether Monexco is entitled to the adjustment of those fees. Notably, the statute provides that fees collected while the Complaint is pending "shall" be adjusted according to the final fee, indicating that such an award is mandatory. However, as discussed above, the statute also contemplates parties may negotiate an interim arrangement. While the parties came to some agreement, the full scope of that arrangement is not before us, including the parties' understanding (if any) as to whether the interim fees agreed upon would be subject to adjustment, whether the parties may have waived remedies available under section 24.5 as a result of conduct, or various negotiations or agreements, the full facts of which are not available from this record. The Court therefore remands this matter to allow the OCC to determine whether any adjustment is to be awarded to fees paid between the Complaint and its Order setting fees, pursuant to section 24.5(F).

CONCLUSION

¶27 For the foregoing reason, the Court holds the OCC's determination that the parties were subject to day-to-day standalone contracts from the time the Complaint was filed through its final order is not supported by substantial evidence. Further, we find the OCC's determination that it had no authority under section 24.5(F) to adjust fees collecting during the period in which the Complaint was pending in accordance with the final fee is contrary to law. We affirm that portion of the OCC's Order that Monexco was not entitled to adjustment of fees paid before the Complaint was filed. We remand this matter for the OCC to determine whether Monexco is entitled to an adjustment of fees paid from the time the Complaint was filed to the entry of Order No. 716416, consistent with this Opinion, and to determine the amount of those fees, if due.

¶28 AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH FURTHER INSTRUCTIONS. 

FISCHER, C.J., and BARNES, P.J., concur.

FOOTNOTES

[1] Monexco is a "shipper" of natural gas as defined by 52 O.S.2011, § 24.4.

[2] From October 31, 2011, the gas from the Warren wells was gathered, treated and shipped via the gathering system at issue under a contract executed by Monexco and Duke Energy Field Services. DCP is a successor-in-interest to Duke.

[3] The record provides the Florence 1-18 well is located in Beaver County and is also operated by Monexco but gathered by another company. Monexco asserted the Florence well was similarly situated to the Warren wells and requested the terms of the gas gathering contract for the Florence well be applied to the Warren wells.

[4] We note that similar language was actually added to a prior version of the statute in 1995. See 52 O.S.Supp.1995, § 24.3.

[5] Badger relies on language in section 24.5(F) that provides that the OCC may provide interim relief upon filing of the "motion of the complainant." Section 24.5(F) does not specify the format by which the complainant must move for such relief. Further, Badger seems to reason that Monexco cannot seek adjustment of fees collected through the final order, because Monexco did not obtain an order from the OCC granting interim relief. However, the record provides Monexco did alternatively reach an agreement with Badger to continue services pending resolution of the Complaint. Section 24.5(F) does not contain language that specifies that the motion, and grant of interim relief, is a prerequisite for the authority also granted by section 24.5(F) that "[a]ny fees for gathering collected during the period a complaint which sets to set a fee for such gathering is pending shall be subject to the fee finally set by the Commission." Moreover, such a holding would be inconsistent with the language of section 24.5(D) that provides the OCC may set interim fees, terms and conditions of service, "[i]f the parties are unable to agree on an interim fee or terms and conditions of service." The Legislature's intent in addressing interim fees in two separate provisions is to be "ascertained from the whole act based on its general purpose and objective . . . [and these two] provisions must be considered together whenever possible to give full force and effect to each." Oklahoma Ass'n. for Equitable Taxation v. City of Oklahoma City, 1995 OK 62, ¶ 5, 901 P.2d 800. (citations omitted).

[6] Ms. Medlin is employed by Cams, which operates Badger, and is the person responsible for negotiating Badger's contracts.

[7] If Monexco's interpretation is correct, and the term "existing contract" applies only to those contracts in force when the statute was passed, or when it was last amended in 2005, the statute could provide the OCC with authority to retroactively modify gathering contracts freely entered into by parties after 2005 and which remain in effect at the time a complaint was filed. We express doubt that the statute, as drafted, intended to afford OCC with such authority without a more explicit statement, particularly in light of the language of section 24.5(A): "Upon the expiration or cancellation of an existing contract, under the terms of the contract, the provisions of this section shall apply." The term, "existing contract," without further Legislative definition, does pose other questions. For example, a shipper and a gatherer might be unable to agree to a written contract. They may proceed under a day-to-day or informal arrangement while the shipper files a complaint. Under section 24.5(F), the OCC would ordinarily have authority to adjust fees paid during the pendency of the complaint in accordance with the final fee. However, if the term "existing contract" and the statute applies as Badger argues, the shipper would not be able to obtain that relief, unless it ceases shipping gas pending resolution of the complaint or a request for emergency relief. While the shipper may be able to obtain expedited or emergency relief from the OCC, there is a potential that a shipper with no other gathering service available will be harmed by a relatively brief cessation in gathering service, without any apparent recourse for that harm under the statute. Arguably, the shipper may have been placed in that position by a gatherer allegedly requiring fees or terms and conditions that are unfair, unjust, unreasonable or unduly discriminatory. To interpret "existing contract" to include an implied contract which arises by virtue of a day-to-day arrangement, even after the complaint is filed, appears inconsistent with the purpose of the statute, though the plain and otherwise undefined term "existing contract" certainly leaves room to be interpreted broadly. We need not resolve this issue here.

[8] Monexco contends, for example, that it would "lose the well" if it was required to temporarily stop delivering gas and temporarily "shut in" the well.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1995 OK 62, 901 P.2d 800, 66 OBJ 2037, 
Oklahoma Assn. for Equitable Taxation v. City of Oklahoma City
Discussed

 
2009 OK 18, 204 P.3d 87, 
IN RE DE-ANNEXATION OF CERTAIN REAL PROPERTY
Discussed

 
1996 OK 125, 932 P.2d 1100, 67 OBJ 3566, 
Neil Acquisition, L.L.C. v. Wingrod Investment Corp.
Discussed

 
2010 OK 88, 245 P.3d 1226, 
SUNDOWN ENERGY, L.P. v. HARDING & SHELTON, INC.
Discussed

 
2012 OK 30, 276 P.3d 1013, 
TRIAD TRANSPORT INC. v. WYNNE
Discussed

 
2013 OK 100, 318 P.3d 206, 
TROXELL v. OKLAHOMA DEPT. OF HUMAN SERVICES
Discussed

Title 15. Contracts

 
Cite
Name
Level

 
15 O.S. 51, 
Consent of Parties to a Contract
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 24.4, 
Definitions
Cited

 
52 O.S. 24.5, 
Discriminatory Fees - Open Access - Commission Authority
Discussed

 
52 O.S. 24.1, 
Refusal to Purchase or Transport Natural Gas - Complaint - Hearing - Orders
Discussed

 
52 O.S. 24.3, 
Repealed
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA